THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY EVANS (Impleaded), Defendant-Appellant.

First District (2nd Division)   No. 61578

Opinion filed October 5, 1976.

HAYES, J., concurring in part and dissenting in part.

James J. Doherty, Public Defender, of Chicago (Timothy O'Neil, John X. Breslin, Richard D. Kharas, and Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, David A. Novoselsky, and Michael R. Lewis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Jerry Evans (hereinafter defendant), after a bench trial, was found guilty of rape and two counts of armed robbery. He was sentenced to concurrent terms of imprisonment of not less than eight nor more than 20 years on each finding of guilt.

On appeal defendant contends: (1) defendant's motion to dismiss for failure to bring defendant to trial within 120 days from the last delay

properly attributable to him should have been granted; (2) as there was no probable cause for his arrest, it should have been quashed and the resulting lineup identification should have been suppressed; (3) the trial court should have ordered the production of the mug books viewed by the complainants; and (4) defendant was not proved guilty beyond a reasonable doubt.

On June 2, 1973, about 10:30 p.m., four men invaded the home of Joy and Daniel Voight at 1917 North Wood Street, Chicago, Illinois. These men robbed the Voights and each of them raped Daniel's wife, Joy. After being identified by Daniel Voight in a lineup held June 5, 1973, defendant was arrested on charges of armed robbery and rape.

Prior to trial, the trial court denied defendant's motion to dismiss for failure to bring defendant to trial within 120 days after the arrest of June 5, 1973. Defendant argued that a continuance to January 14, 1974, allowed on November 16, 1973, was erroneously held by the trial court to be by agreement; and a one-day delay which resulted from defendant's waiver of a jury trial on the 120th day of the term, causing the trial to begin on the 121st day, was all erroneously attributed to defendant.

Defendant's motion to quash his arrest and suppress his subsequent identification in a lineup following that arrest was considered by the trial court together with the trial on the merits and denied at the conclusion of the State's case.

At trial the Voights testified that four uninvited men entered the unlocked front door of their home about 10:30 p.m. on June 2, 1973, held them at gunpoint, took Daniel's wallet and Joy's rings, ransacked the house taking several other items, raped Joy, and tied up both Joy and Daniel before leaving the house.

Joy Voight made an in-court identification of defendant as the second man of the four to enter her home on the evening of June 2, 1973. She had also previously identified him at a preliminary hearing. Joy could not recall giving any description to the investigating officers on the evening of the offense. On cross-examination, she described the men as they appeared that evening. The first offender to enter the house carried a gun, was a Negro between 5'9" and 6', had sideburns, bushy hair, and wore platform shoes; the second offender (previously identified as defendant) was clean shaven, his hair was shorter than it was at the time of trial, and he was between 5'8" and 6'; the third was short, heavy, and wore checkered pants. The only fact she could recall concerning number four was that he was the skinniest. Joy admitted she wore glasses and could not see distances very well without them. On the evening of the offense, she had her glasses on until they were removed by one of the offenders.

Joy testified that, at their home on the day following the incident, she and her husband viewed pictures supplied by the police. Defendant was

not identified from any of those pictures, although they did identify two of the other offenders. On the same day the Voights also viewed a lineup at the police station in which no suspect was identified. On June 5, 1973, the Voights separately viewed another lineup from which Joy identified two suspects—neither of whom was defendant. From that same lineup Daniel also identified two suspects, one of who was defendant.

Daniel Voight made an in-court identification of defendant as the second offender to enter his home on the evening of June 2. He corroborated his wife's testimony that defendant took the gun from the lead man who had entered carrying the gun, and led Daniel to the kitchen while his wife was taken to the bedroom. Daniel testified he could not remember exactly how he had described the offenders on the night of the incident. To the best of his recollection, he testified that he had told the officers the offenders were all clean shaven, except for sideburns, and that they were all pretty young. After having his recollection refreshed by defense counsel, Daniel admitted having described the second man who entered the house as a male Negro, 16 years old, 5'1" to 5'3", 180 to 190 pounds, black coat, tan jacket. Other offenders had been described as follows: one a male Negro, 19 years old, between 5'9" and 5'10", black waist-length jacket, green-brown plaid checkered pants, and platform shoes; another, a male Negro, 20 years old, 5'7" to 5'9", 130 pounds, black leather jacket, and black shoes.

Daniel also related viewing photographs at his home and at the police station from which offenders other than defendant had been identified. Daniel testified he had identified defendant as one of the offenders during a lineup which took place on June 5, 1973. He stated he was not blindfolded at any time during the incident, and that the lights in the house were on during the entire time.

Several policemen testified regarding the investigation and the arrest of defendant. Charles Fields, a Chicago police officer, testified that on June 4, 1973, he arrested Willie Ligon who was driving an automobile which had been taken during a home invasion at 4647 West Race on June 3, 1973. Officer Howard Hagen testified that he questioned Willie Ligon after his arrest. During the course of that questioning, Willie implicated three other persons in the home invasion of June 3, 1973—Versie Gilmore, Donnie Gilmore, and Eugene Davis. Officer Hagen also talked with Versie Gilmore and Eugene Davis, both of whom discussed not only the June 3 offense, but also the June 2 invasion of the Voight home. In connection with the invasion of the Voight home, they both implicated a person by the first name of "Jerry." Officer Hagen testified that a subsequent investigation revealed that the person called "Jerry" was Jerry Evans, defendant. Defendant was arrested after coming to the police station pursuant to a telephone request by the police.

Timothy Nolan, a Chicago police officer, testified regarding the photographic identification by the Voights of suspects other than defendant. Nolan did not know if defendant's photograph had been among those in the mug [photographs] books viewed by the witnesses. A defense motion for the production of those books during Officer Nolan's testimony was denied.

James Phelan, a Chicago police officer, corroborated the testimony of the Voights regarding the June 5, 1973, lineup. He indicated three suspects were identified at that time. Joy Voight identified two suspects, neither of whom was defendant; and Daniel identified two suspects, one of whom was defendant.

It was stipulated that defendant was 18 years of age; and that Joy Voight was treated at St. Elizabeth Hospital on the night of the incident and that the examination indicated the presence of sperm.

At the conclusion of the State's evidence, the trial court denied motions for a directed verdict on the basis that the State had not proved probable cause for defendant's arrest, that the lineup identification by Daniel Voight should be suppressed, and that the lineup identification tainted the in-court identification by Daniel.

Marilyn Moore, defendant's girl friend, testified that, at the time of the incident, she was with defendant at his home where she met his mother for the first time. Defendant also testified on his own behalf, claiming to have been with Marilyn at the time of the incident.

## I.

Defendant's first contention is that he was not brought to trial within 120 days of the last delay attributable to him in violation of section 103—5 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 103—5), which provides:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, * * *."

Defendant in his brief claimed the following violations of the 120-day rule on an "either-or" theory: (1) on November 16, 1973, a continuance to January 14, 1974, was entered on the record "by agreement" when in fact it should not have been so charged; and (2) on May 13, 1974, the case was called for trial on the "120th" day, and the trial court began reading the indictment to the jury venire. At that time the defendant waived the jury, whereupon the cause was continued until the next day, which the defendant alleges was the 121st day.

At oral argument counsel for defendant withdrew the second theory which contended that the trial court erroneously attributed the May 13,

1974, delay to defendant. We commend counsel for withdrawing this contention and note that in our review of the record we concluded there is no merit to this contention.

Defendant was arrested on June 5, 1973. On August 6, 1973, the public defender, pursuant to his appointment as trial counsel for defendant, filed his appearance. A short time later, the public defender was given leave to withdraw his appearance for defendant, and on August 29, 1973, Joseph A. Malek filed his appearance as private counsel for defendant. On November 16, 1973, Mr. Malek requested the trial court to set the case for trial and filed a motion for pretrial discovery. The prosecutor indicated that a response to a defense motion for pretrial discovery had previously been filed, and he tendered defense counsel a copy of that response. The prosecutor also informed the court that he had filed a motion for discovery, "perhaps before Counsel appeared on behalf of his client"; and that that motion had not as yet been answered. The prosecutor then gave defense counsel a copy of that motion which had been filed on August 29, 1973.

Despite the contention in defendant's brief that no copy of the prosecution motion had been tendered to Mr. Malek on August 29, 1973, the transcript of the proceedings of that date shows that a copy of the State's response to defendant's pretrial discovery motion was tendered in open court to Mr. Malek.

On November 16, 1973, when the trial court ruled that the continuance would be by agreement because defendant's discovery was not completed, no objection was made either by defendant or his counsel, Mr. Malek, both of whom were present in open court. No written post-trial motion for new trial was filed, and, in defendant's oral motion for new trial, no mention was made of this alleged error.

■■ Based on the record in the trial court, it is clear that the "by agreement" continuance on November 16, 1973 was so stated by the trial court with no objection by defendant. The defendant contends that the extension of time on November 16 in order to allow time for defendant to answer the State's pretrial motion for discovery should not be charged to defendant on the basis of *People v. Shields* (1974), 58 Ill. 2d 202, 317 N.E.2d 529. In *Shields* our supreme court held that defense counsel's request for a one-week delay to file an answer to the State's notice-of-alibi request should not have been a delay attributable to the defendant. Counsel for Shields had only been appointed seven calendar days prior to the delay and, as the court noted, the long delay by the State in obtaining the indictment and arraigning the defendant really caused the delay. In the case at bar we are satisfied there was no attempt on the part of the State to evade the 120-day rule. In fact, contrary to *Shields*, we are satisfied that the delay on November 16 was caused by the failure of

defendant to have completed the pretrial discovery served on defendant in open court on August 29, 1973. (*Cf. People v. Fosdick* (1967), 36 Ill. 2d 524, 528-29, 224 N.E.2d 242.) Thus, the trial court correctly ruled the November 16 continuance was chargeable to defendant and the motion to dismiss was properly denied.

## II.

■■ Prior to trial defendant, claiming the police did not have reasonable grounds to arrest him, moved to quash his arrest and suppress the subsequent identification of him made by Daniel Voight. The trial court considered this motion with the trial testimony and denied the motion at the conclusion of the State's case.

An arrest may be made by a police officer when he has a warrant, or when he has reasonable grounds to believe that a warrant has been issued in this State or another jurisdiction, or when he has reasonable grounds to believe that the person is committing or has committed an offense. (Ill. Rev. Stat. 1973, ch. 38, par. 107—2.) The burden of proving the validity of an arrest shifts to the State when the defendant has shown that he was doing nothing unusual at the time of the arrest and thereby makes a *prima facie* case that the police lacked probable cause to arrest him. *People v. Williams* (1st Dist. 1973), 16 Ill. App. 3d 440, 442-43, 306 N.E.2d 678; see *People v. Riszowski* (1st Dist. 1974), 22 Ill. App. 3d 741, 746, 318 N.E.2d 10.

At the conclusion of the State's case, defendant moved "for a directed verdict relative to the motion to suppress." At this point the only evidence in the record concerning defendant's arrest was a stipulation entered into by the parties that defendant was arrested when he walked into the police station some time on June 5, 1973, pursuant to a call made by either Officer Simandel or Officer Diciolla, neither of whom testified at the trial. Defendant introduced no evidence that the arresting officer did not have a warrant for his arrest; nor was any evidence presented concerning the defendant's behavior at the time of the arrest. Based on the facts before the trial court at the time defendant made his motion, in our opinion, the defendant had failed to present a *prima facie* case establishing the illegality of his arrest.

■■ Assuming arguendo that the defendant had made a *prima facie* case establishing the illegality of the arrest, we find sufficient evidence in the record to show reasonable grounds on which to arrest defendant for further investigation. The complainants had described the offenders and identified one, Versie Gilmore, as a suspect during the viewing of mug books at the police station. The police interviewed Versie Gilmore and another suspect in the case, Eugene Davis, both of whom implicated a person by the first name of Jerry. The investigating officer testified that

upon subsequent investigation the full name of the person called Jerry was determined to be Jerry Evans. When the defendant walked into the police station pursuant to a telephone call, there were reasonable grounds to arrest the defendant. The lineup that followed was a permissible step in the investigation of the alleged crime. The trial court properly ruled that on the evidence presented, the arresting officers had probable cause to arrest the defendant. See *People v. Bambulas* (1969), 42 Ill. 2d 419, 423, 247 N.E.2d 873, *cert. denied*, 396 U.S. 986, 24 L. Ed. 2d 450, 90 S. Ct. 480; *People v. Colbert* (1st Dist. 1973), 10 Ill. App. 3d 758, 760-61, 295 N.E.2d 225; *People v. Brooks* (1st Dist. 1976), 40 Ill. App. 3d 996, 353 N.E.2d 234. For an interesting discussion re probable cause, see *United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820.

### III.

Next defendant contends the trial court should have ordered the production of the "mug books"[1] viewed by complainants so as to determine if the complainants had previously failed to identify defendant as one of the offenders. Defendant contends that, if his picture was among those shown to complainants and if they failed to identify him, this would seriously affect the credibility of the in-court identification of defendant, as well as the credibility of the prior identifications at the preliminary hearing and lineup. Defendant argued that he did not know of this evidence until it was disclosed at trial, and that he was under the impression that the only photos viewed by the complainants had been those shown to him by the State in discovery. However, the trial court denied the request, pointing out defendant had had adequate time prior to trial to subpoena this evidence, which he did not do.

■■ Whether the trial court should allow a motion to inspect "mug books" is a matter of discretion. (*Cf. People v. Murphy* (1952), 412 Ill. 458, 560, 107 N.E.2d 748, *cert. denied*, 344 U.S. 899, 97 L. Ed. 695, 73 S. Ct. 281.) Under the circumstances of this case, the trial court should have ordered the production of the mug books; however, we do not feel the trial court's failure to order such production prejudiced defendant. Defendant did not establish that his picture was among those viewed by the complainants in the "mug books." The officer who showed the photos to the complainants did not know if the defendant's picture was among them. Yet even if it were, the complainants viewed several photographs,

---

[1] A "mug book" as commonly known, consists of a series of photographs of different individuals. For each person there is generally at least two views, front and profile, of a person and a police number on each photograph. See Annot., 30 A.L.R.3d 908 (1970).

and their failure to pick out defendant, when they later made a positive identification of him both in court and at the preliminary hearing, would have had little effect on their credibility. See *People v. Camel* (1974), 59 Ill. 2d 422, 436, 322 N.E.2d 36.

The trial court's failure to order the production of the "mug books" viewed by the complainants on a motion made by defendant during trial was not prejudicial error.

## IV.

Defendant argues the evidence produced by the State is not sufficient to find him guilty beyond a reasonable doubt. He argues that the identification testimony of the complainants was incredibly weak, and that the defendant's alibi testimony was more than adequate to create reasonable doubt. Neither Daniel nor Joy Voight were very certain about defendant's height. Daniel described the second man to enter the house as wearing checked pants and a red jacket, no hat, platform shoes, and average kinky hair. The only description Joy could give was that he was clean shaven and had shorter hair than that which defendant had at trial. Defendant also argues Joy's failure to identify defendant during the June 5, 1976, lineup proves her later identification of defendant was dependent on her husband's identification of him at the lineup.

■■ Failure to identify a defendant in a lineup does not negate the credibility of a later identification of that same defendant. (See *People v. DeMorrow* (4th Dist. 1974), 17 Ill. App. 3d 901, 909-10, 308 N.E.2d 659, *aff'd*, 59 Ill. 2d 352, 320 N.E.2d 1.) Also, under Illinois law it is not necessary to have precise accuracy in a description to support a guilty verdict beyond a reasonable doubt where there has been a positive identification. See *People v. Catlett* (1971), 48 Ill. 2d 56, 63, 268 N.E.2d 378.

■■ In the case at bar, it is clear that the complainants had an ample opportunity to view their assailants' faces under good lighting conditions. The in-court identifications, as well as the identifications at the preliminary hearing, and Daniel Voight's identification during a pretrial lineup, were all positive and convincing. A positive identification by a single witness is sufficient to support a conviction. *People v. Williams* (1975), 60 Ill. 2d 1, 12, 322 N.E.2d 819.

Conflicts in testimony are for the trier of fact. There is no obligation for the trier of fact to believe alibi testimony over the positive identification, as here, of the defendant. *People v. Setzke* (1961), 22 Ill. 2d 582, 586, 177 N.E.2d 168.

We have carefully reviewed the record and are satisfied that there is sufficient evidence to support the trial court's finding of guilty of the defendant beyond a reasonable doubt.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS, P. J., concurs.

Mr. JUSTICE HAYES, concurring in part and dissenting in part:

I concur in the result and in what is said in Parts I, III, and IV of the opinion of the court. I dissent from what is said in Part II of the opinion for the following reasons:

In my opinion, defendant did make an adequate prima facie showing of no probable cause for his arrest. His testimony by stipulation was that he went to the police station in response to a telephone call from a police officer requesting that he do so. When he got there, he was arrested, put in a lineup, and identified by Daniel Voight but not by Joy Voight. His failure specifically to state that his arrest had been without a warrant is of no consequence here because the stipulated circumstances make it obvious that the police had no warrant for his arrest. The stipulated circumstances also make it obvious that he was doing nothing unusual at the time of his arrest.

Again in my opinion, when the burden on the issue of probable cause for his arrest shifted to the State, the State did not produce adequate testimony of probable cause because there is no testimony whatever as to how the police determined that "a man named Jerry" was Jerry Evans..

I conclude that the lineup identification of defendant by Daniel Voight should have been suppressed.

Again in my opinion, we need not decide whether the preliminary hearing and in-court identifications of defendant by Daniel Voight should also have been suppressed as impermissibly tainted by the lineup identification, because the failure to suppress the lineup identification, while error, was harmless error which was not prejudicial to defendant for the reason that Daniel Voight's preliminary hearing and in-court identifications had a prior independent origin, namely, his on-the-scene observations of the unmasked intruders into his home for a period of 30 to 60 minutes with all the home lights burning. The positive identifications of Daniel Voight based on that prior independent origin are sufficient to enable the trier of fact to find defendant guilty beyond a reasonable doubt, as the opinion of the court concludes in Part IV of the opinion.

Further, the suggestion that the preliminary hearing and in-court identifications of defendant by Joy Voight were based in some manner on Daniel Voight's lineup identification is merely speculative, in view of the same prior independent origin for those identifications by Joy Voight.